I am pleased and honored to have Judge Biggs sitting with us this morning by designation. We will now hear argument in our first case, 151446 et al., Mr. Sexton. May it please the court, my name is Scott Sexton and I represent the plaintiff below and appellant here, Reverend and Mrs. Thomas, the property owners of the property at issue. We would like to address with you three issues today, the core rulings of the ruling below, which involve an old piece of property that is subject to an 1849 severance deed. The questions really relate to the yard clause, which is the primary issue, and then the second issue is whether the parties intended that the grantee could destroy the surface of the property if a contrary intent was expressed in the deed, and the third issue involves the interpretation of two chancery deeds from 1901 and 1902, and those relate to a gray vein of limestone, and the question there is simply whether the intent was to convey the entire stone estate on this large piece of property, or simply a singular portion in the southern part of the property. Could I just clarify one thing? I believe you said that the argument is that the appellees are entitled to destroy the entirety of the state despite an intent expressed to the contrary, and in that, if I could just finish it would help you I think, are you referring there specifically to the yard restriction? Is that what you're referring to? Not just the yard restriction, Your Honor. In addition to the yard restriction, as the district court points out, there are numerous other restrictions that the grantor retained, for example, the rights that he would have all of the timber, the rights that the grantee would have to maintain fencing so that his cattle and whatnot would not be injured by quarrying operations. I understand. All of those as well. Thank you. Did the district court rule on those restrictions? Was there a dispute? The court ruled that those restrictions expressed an intent by the grantor and the grantee that in fact the grantor would continue to enjoy the estate as a plantation, which was how he used it. Right, so you're just using that as evidence of the fraud or intent. Correct. When we all know that that was the intent of the grantor, the question is, knowing that, can the grantee still destroy the surface? That's the issue. So I think now it's very well framed. If I could, I'd address the 1849 Deeds of the Yard Clause. This is a prohibition within the deed that simply states, and you all have probably seen it, it is also agreed and understood between the parties that Wilson, that's the grantee, and his heirs or assigns, it passes with the land, is not to blast or quarry or take away any stone within the enclosure of the yard attached to the said Reynolds present dwelling house. The dwelling house still exists. It's there. It's an 18th century stone dwelling, and it's very rare, and the plaintiff desires to protect it. In your response to the assertion that, first of all, it cannot be identified with any degree of certainty, and second of all, the property isn't zoned residential, would be what? Okay. As to the identity of the house itself, that is not an issue that the district court accepted below. The district court accepted that this is the house. He said in oral argument that he accepted that, and in footnote 15 to his opinion, he states that he assumes that. Well, I was speaking to, perhaps I wasn't clear, I was speaking to the parameters of the yard. Okay. So if talking about the yard, we know that the yard is attached to the present dwelling house. So where the dwelling house is a very good indication of where the yard is. But what does it tell you about where the yard begins and ends? Okay. In this instance, the defendant's expert agreed that it would be at least 50 to 70 feet from the house. We accept that. For present purposes, we accept that. Now, in addition to that, we hired experts who opined that the yard would have had a lot of outbuildings, and he identified the barn, the spring, and things of that nature, and said it would have been roughly perimetered that way. There was some dispute down at the court below, which was never discussed by the court, but which the defendants raised, as to whether it was, in fact, fenced or not fenced. It's completely irrelevant. If you want to see the key Virginia case on this issue that shows exactly how much detail is required, go to the case of McGreery. That is a case in Virginia in which the court set forth exactly what the standards were, and all that is required under Virginia law is proving the probable intent. That's a direct quote from McGreery. Probable intent as to the location. We don't have to prove with exactity. If you look at the appellee's pleadings and arguments, they're always making fault with the fact that it's not. Well, we don't know exactly where it is. I don't know exactly what I ate for breakfast yesterday, but I do know I ate something. You are concluding that the judge erred in making that an issue. The judge did not make it an issue. If you search his opinion, he does not base it on the fact that, oh, I don't know where the yard is. If the question had been where the yard is, he would have said it was a fact issue. He wouldn't have ruled on it. Doesn't he talk about the difficulty in determining the parameters? If he does, it is in an afterthought. His main problem with the whole thing, Judge Biggs, was simply that he did not see how the grator could restrict the grant. In other words, I'm giving you all this limestone, but you can't quarry, blast, or even take away any stone in this area right here. First of all, the question is determined at the time of the grant. Did Reynolds and Wilson know where Reynolds' yard was? Yes, they did. I thought, like Judge Biggs, I thought that the district court did express concern that it would be challenging, if not impossible, to determine the present-day boundaries, and I understand you think that that may have been an afterthought, but it was nevertheless a factor upon which the district court appeared to base its determination. I disagree. With what? Because, if you read his opinion... No, no, with any particular thing or with everything. I disagree that he based his opinion on that. He based his opinion, in this order, on two things. First, if you're going to restrict the grant at all, what he says is that the grantor must reserve a fee interest. You can't tell the grantee, hey, you can't blast, quarry, or take away stone here. You have to reserve the fee interest. That is his first ruling, and that is why, Judge Duncan, he said it is void from the outset. If the location of the yard was the problem, it wouldn't be void from the outset, because obviously Reynolds and Wilson know where Reynolds' yard is. So he says it's void from the outset. He then goes to an alternative analysis, where he gets, I think, well-gathered on the notion of occupancy. We point this out very well, that he misreads the clause, omitting a critical comma, that comes right before the phrase, from annoyance. But in that instance, Judge Duncan, he's talking about the notion of occupancy. I would refer the court to JA 240, which we supplemented yesterday, or the day before, with a filing of a clear copy. You each should have a copy of this. This is the yard clause, and it is legible. If you look right, it says occupancy of the house, comma, space, from annoyance. Those who may be in occupancy of the house is an independent clause in that phrase. And so occupancy does not go back and modify Wilson, Reynolds, or his heirs or successors. So grammatically, the court's reading of the clause was completely incorrect by omitting the comma. This is an unfortunate mistake. We submitted to Judge Conrad this very page. And it is in the record at his docket number 210-5, Exhibit 5, to docket number 210. Are you conceding that occupancy denotes a physical presence in the house? No. Occupancy only applies, first and foremost, to those other persons who may be in occupancy. The word occupancy doesn't bleed over at all onto Reynolds or his heirs or successors. So you've got three categories of people. Reynolds, his heirs and successors, that's us, and other people who might be in occupancy of the house, comma. And it protects all three of those categories from annoyance. Trust me, we're annoyed by the notion that Carmuse wants to destroy this 18th century home. And so occupancy simply does not bleed over. And grammatically, if you construct the sentence, it just doesn't work. Well, but let's say we disagree with that. So what's your fallback with respect to occupancy? Does it require a physical presence? Okay. Occupancy, in this instance, would not, in our opinion. I think it relates to a desire to use the property in some beneficial manner, just as Justice Thomas does. Judge Conrad implied modern concepts of like residency, like real estate residency, of modern zoning. Bear in mind, this is 1849. This house was built in the 1700s. There was no zoning for Reynolds or Wilson. And every single thing that you do as judges, you have to go back and place yourself in the mind and circumstances of those grantor or grantee. You do not judge the language from today. You do not judge the property distinction from today. You do not judge it as to whether I can go out and easily do it today. It's all judged based upon, did Reynolds and Wilson know? And can we reasonably ascertain what they know? Can't there be a changed circumstance? Changed circumstances is a concept that deals strictly with restrictive covenants. Restrictive covenants are, as pointed out in Cheatham v. Taylor, those are restrictions that regulate the style and cost of buildings erected on a tract that is being sold in parcels. They restrict the location and the manner in which the property can be used. Here, there is not a restriction. There is a prohibition. Mr. Wilson, you can't blast, quarry, or take away anything here. You don't have to blast with just a little bit of dynamite, or you don't have to blast 50 feet. You can't do that at all. So it's not a restrictive covenant. Restrictive covenants are completely separate. The defendant, Carmus, tried this every single time below. He tried it with Judge Turk. He tried it with Judge Conrad. Judge Conrad never bit. He never cited or agreed with that line of cases, which is the Chesterfield case, which is not even a deed case. It's a covenant case. So from the word go, that has been a defense, and from the word go, it has been rejected. Now unfortunately, Judge Conrad kind of bled that all together and used some concepts to say change circumstances. But what he was doing, if you go back and look, Judge Turk, as you all know, ruled that the clause is not subject to occupancy. Here's a critical point. Judge Conrad agreed with him. That is the law of the case. The clause is not subject to occupancy. Judge Turk ruled it. Judge Conrad accepted it and confirmed it and agreed with it. And that hasn't been appealed. So when you look at this occupancy clause, the law of the case is, it is not conditioned upon occupancy. Now you're not suggesting that it was law of the case when Judge Turk ruled it. No. I'm suggesting that it has not been appealed and Judge Conrad affirmed specifically that ruling. What he said was, when you're considering the circumstances, I take that into account. In other words, you know the cases that say you have to go back and consider the facts and circumstances of the parties in the grant or grantee position. He says one of those circumstances is they use the word occupancy. So in that sense, he colored his later analysis by that and said, you know, there's nobody occupying it. It can't be zoned this or that. Bear in mind, half of this property, when we're talking, hopefully later, about the 1901 and 1902 deeds that have the gray vein, that's the only part of this property that is even zoned for mining. The rest is zoned agricultural, which, unlike Judge Conrad got this wrong in his opinion, A-1 designation, that's an agricultural designation, you can build a residence on it. In fact, most farmers' homes sit on A-1 designation properties. I see that my, I think my time, I'm now in the deficit. You will have, you reserved seven minutes for rebuttal. Okay, thank you. Thank you. Mr. Hagan. I'm Robert Hagan from Fincastle in Botetourt County. I'm going to address the plaintiff's arguments on the yard clause and on the 1901 deeds, which they really haven't spoken to as to whether or not less than the full estate was conveyed by the 1901 deed. First, as to what we call the repugnancy issue, a land title always begins with the deed. When you read this deed, the most important language is not the exceptions or reservations that come later. The first thing you read is always the granting language. The granting language in this deed is extraordinarily emphatic. All of the rock and, all the rock or stone, particularly including limestone on every part of said rental's land, and they repeat that language again and again. So that's an absolute, unconditional, fee simple conveyance of all the rock or stone on every portion of rental's land. Now when you read the deed, then you come to the yard clause language and the purported exceptions as to right to crop and right to take timber and right to keep fences. And when you read through this deed the first time, a title lawyer's first thought is repugnancy. You have an emphatic fee simple grant, unconditional fee simple grant, and they tried to claw back part of what they'd taken. And your first question is, what did they take? And is it clear and unequivocal what they took back? We're speaking of the modern rule of repugnancy. The common law rule, which probably was still in effect in 1849, was that you could never take back from an absolute grant. You could never have a reservation of a fee of interest and on the one hand, Thomas' expert said, well this is a fee simple reservation of the yard. Whatever it is, rentals retained ownership of that ground. On the other hand, he said at a different point, that maybe he just accepted the right to prohibit that rock from being taken. So he ran the rock, but then he said you couldn't take it. Mr. Hagan, the law of repugnancy applies where two things can't mutually coexist. So for example, in the Virginia case of Cape Heart, the granting clause conveyed a fee simple, but the preamble said that the grantee was receiving a life estate. Both those things could not be true. That's not the case here. This is a case in which a fairly common occurrence occurred, and that is the grantor reserved to himself and his family, bears and assigns the enclosure of the yard attached to the dwelling house to protect the family or other persons who may be in the occupancy of the house for annoyance. I don't understand why those two things can't coexist, and if they can coexist, the doctrine of repugnancy can't apply, or another criterion for the doctrine of repugnancy is that it's impossible to discover with reasonable certainty the intent of the parties, and it seems to me that the intent of the parties is pretty easy to discover here. The grantor intended to reserve to himself, herself, the right to the home. Your Honor, I understand the rule of repugnancy in this context differently. There are lots of rules of repugnancy in the law. Well, actually, I was reading from Virginia case law in Cape Heart. Cape Heart raises the distinction between, and I forget my law school black letter, but the estate, the life estate is a temporal estate carved out of the fee simple. Correct, and you can't be giving both a fee simple and a life estate, so the rule of repugnancy applies. And that's one kind of repugnancy, but in this case, the question is, and Thomas' own lawyer got confused by it, are they reserving land, a piece of the land, or are they reserving just the right to prohibit the taking of rock from a piece of land? And it's conceptually different than the temporal estate, extent of the estate. Well, Wilson is, as there are signs, is not to blast or quarry or take away any stone within the enclosure of the land attached to the said present dwelling, and then goes on to explain why. Yes, Your Honor. I think it's important that this is a deed. We have special rules of constructions for deeds and wills because they have to speak unequivocally and they have to speak for all time. And when we speak of construing a deed, we speak of the legal intent. We don't have to go back. What is unclear about the legal intent of that language? Well, I think in conveyance and for land titles, the important thing is, what did you take away from the absolute grant? What was your intent in taking away? Did you intend clearly and unequivocally to hold back some land, or did you include clearly and unequivocally to hold back some right to use that land? And if you did, for how long? For perpetuity or for how long? And if it's not clear and unequivocal, and that's what Judge Conrad found, it's not clear and unequivocal, and so that attempted reservation or exception fails. And you do understand that we don't have to agree with Judge Conrad. That's why we're here. And one of the, what I'm trying to get you to explain to me is the lack of clarity. It's certainly intended to protect the family of said rentals and his heirs or sons. Yes, Your Honor, but in land title, it's intended to protect the family. But what portion of the legal estate does that refer to? Does it refer to a piece of the ground, or does it refer to the right to use a piece of the ground? Well, can't you simply adopt the most conservative approach and say that it intended to accept the right to blast, as opposed to accept a mini fee simple, if you want to call it that? Your Honor, you run right into an anomaly there. Did it accept the right to blast in the yard in this 50 by 70 space, or did it accept the right to blast so that the rocks would come down on the house? There's an ambiguity as to what blasting is prohibited. And the ambiguity lies in the question about protecting from annoyance. Okay, I missed that. When you say there's an ambiguity in what blasting, talk to me about that. As to where you can blast, does this only prohibit putting a stick of dynamite in that 50 by 70 square rectangle of land, or does it prohibit blasting over the hill if those rocks are going to come down on the house? When you say protect from annoyance, if protection from annoyance sets the scope of the prohibition, then that is an ambiguous prohibition. But that it didn't. It is, all it does is explain the reason for the scope of the preceding provision. This provision is inserted to protect the family. It doesn't purport to establish physical parameters. Yes, Your Honor, and I think that's why it's ambiguous as a term of land law. If you're going to claim that you have a land right, and you have, you've granted all the rock and stone of every description on every part of said Reynolds land. If Reynolds is going to come back and say, I didn't give you the whole thing, the question is, what did you retain? And that's where the question of ambiguity comes in. You retained the right to be free from annoyance. No, you maintained the right to not have stone taken away from the yard enclosure. Yes, Your Honor. We go back to the CNX and RASNIC case from January of 2014, which picked up on the KPAR case. The KPAR case was unusual because it dealt with the preamble to the deed and didn't deal with granting language. Can you get to your result without the rule of repugnancy? Can you get to the result that you need without applying the rule of repugnancy? Well, there's the second ground that was upheld by Judge Conrad, and that's the fact that under the Bradley case, there have been so many changes. The first rule in land law is productivity. Land needs to be productive. And in the Bradley case, in those general terms, a cemetery had been reserved and there was no one left. The graves had been removed, but it wasn't being used. And so the Bradley case is an unusual case, but the similar principles do apply in this case, that in 1849 right to raise a family in a home, by the time you get to the 21st century, and the property has been zoned M3 for Quarian, and the house is a derelict, the question is, what are you enforcing there? If it's an incorporeal right, if you didn't reserve the land itself, the 50 by 70 feet, if you didn't reserve ownership of that land, if you reserved something else, what did you reserve after the house has become derelict and it's been long abandoned? Under your theory, I'm curious, what exactly do the Thomases own? The surface. They own the surface and they can use it. But you can disrupt. Yes. Yes, they own the surface until the surface is taken. They own a temporary right of occupancy. Thank you. Mr. Lawson? Thank you. May it please the court. My name is Thomas Lawson. I'm here on behalf of Carmuse. Our positions were Helms and Carmuse are the owners of the mining interest, the underground, if you will, versus Thomas, which is the surface. And not to belabor the point, but to go briefly to the issues of what I believe Judge Conrad did, and we both are in agreement, Helms and Carmuse, that he did it properly, was he sifted through, I think he said over 1,000 pages of evidence, documents, the various deeds that were presented as recently as yesterday, again. And what he found on the rule of repugnancy was that this restriction was ambiguous. And I believe the case law is very clear on this in the CNX gas case, that when you've got ambiguous provisions and you juxtapose those with the fee grant, the court is going to do what Judge Conrad did and interpret it as being repugnant and throw it out. He did kind of do a belts and suspenders opinion, though, and he also heard the evidence about the change in circumstances. And you all have talked very well about that, but probably the most telling was there are words such as from annoyance and so on. And a question was asked, and I think it goes a little further to say, you need to be an occupant to be annoyed. And the phrase and Judge Conrad did well to read those words together. And what was intended was there was a brief reservation and a carve out so that these heirs or assigns could live in a house and in a yard, and the judge didn't need to go into the depth of the evidence about whether this was the yard at all. In fact, there was evidence in the record that this was a stone cabin, it was an outbuilding, and that the house was the structure that was up on the hill. This stone cabin sits low, and when the properties were together, there was a prominent structure on the hill. Logic would say that was the house. Judge Conrad didn't go into the details of that because he was able to go through the evidence that had been presented and apply not only the rule of repugnancy, but also the doctrine of changed circumstances. And, of course, that was that whatever that structure was, no one had lived in it for decades, and we've talked about zoning and where the zoning line is and so on. It's very clear where the property sits, where this structure sits, it's zoned for mining and you cannot live, and it had been in that status for many, many years. You cannot live on that property. There are other portions of the property. But zoning can change, can't it? It could. It could. And there was arguments, for example, that somebody could, in theory, occupy and so on. But, again, what Judge Conrad did was he considered the evidence, the totality of these words, he found them to be ambiguous, listened to the evidence, and said this restriction has, number one, I'm having a hard time understanding what it means, especially when you and so on, and I think very properly ruled that the rule does apply. And then he, again, bootstrapped it, although he ruled as two separate findings that the change in circumstances would apply. I've forgotten who asked the question. If you don't have one, do you still have the other? And I believe the way Judge Conrad ruled, yes, you do. He could have ruled on either and then just said the next argument is moot, I don't need to rule. But he went to the trouble of ruling on both. And, again, I don't think he spent much time, for the purposes of summary judgment, getting into the merits of is this the house and is this the yard, and if there's a yard, how big is it, and so on. There was all kinds of testimonies about what one would have in the 1800s by way of an enclosure around their home. And, certainly, I think we can all appreciate we didn't have lawnmowers and things like that, so the concept of a large yard just didn't exist at that time. But Judge Conrad didn't need to do that, and, again, I believe he very appropriately ruled with regard to the contest between the mining rights and the surface rights. And the surface, someone asked, what is the surface owned? He owns the surface subject to the mining rights. And it's interesting, if we read the deed, the individual that retained the right for this house and yard retained the right to process lime and mine lime and harvest timber and so on. That's what was going on on this property. This was not some eucolic field. This was, to quote one expert, moonscape, because the trees would have been all cleared to fire the kilns and the mining and methods that they used at that time. Gunpowder was very much alive and well. It just wasn't as precise as it is today. But the earth would have been removed in various places. And, again, his statement was this would have looked like the moon. And so if someone is living in a home and has this reservation, he has it for the purpose that he can do that, too. But, again, that reservation by Judge Conrad's ruling is gone. We did have one error that we noted with regard to Judge Conrad's ruling, and that was the is a finding and called out as an error that we need to have in the court's decision a line, something that, to quote from the cases, will fit to the ground or fit to the property, something in the land records that one can apply, go out to the property and strike a line and say, this is your mining interest and this is your mining interest. And, unfortunately, Judge Conrad did not do that. And, indeed, in his opinion, he gave us some guidance by saying that perhaps you could do a geological survey when you get to the point that you're going to mine to determine where that halfway point is. And our position is that the easiest way and the best way, and this would be in interpreting any matter of title, would be to chain back and look at our predecessor deeds and, in particular, what the Chancellor did before the 1901 and 1902 deed. And he found a strike line, that's the 300-foot line, to separate the mining interest. It was not only this property, but there was properties contiguous to it on either side. And that was where we first got reference to half the stone, half the mining interest. And it's our error that we've noted that that's what Judge Conrad should have done, is harken back and apply the references in our deeds, in our predecessor deeds, and find that that is, in fact, the line and not require us to do a geological survey or, honestly, we don't know exactly what that means, but to open up the earth, I suppose, and find out where exactly the limestone is and then determine whose half is whom. And you're suggesting that this court should do that or it should be remanded to district court to do that? We believe it's actually in the deeds. The deeds are very helpful, and when you do title work, extensive title work, it's a little like a puzzle. There's references to is it ambiguous or not and can I consider these things or not, but every deed takes with it what its predecessor gave them. Or work it another way, you can't have something if your predecessor didn't have it to give it to you. And if you go back into the chain and when you explore this mining interest, these folks were very sophisticated at the end of the 1800s, beginning of the 1900s, and mining limestone was alive and well back then as it is today. And the chancellor who was tasked with splitting up the interest did a fine job and struck a line. And that's where you see the reference to half, and frankly, that's the only reference to half. All the other suggestions, including Judge Conrad's, are you need to open up the earth to some degree to find out where the half is. Or in Helms' brief, you find some outcroppings and then strike some lines off of those. All the experts tell us what you see on the surface is not necessarily what's below the ground, and in fact, because nature laid it down, the limestone down, it is most definitely irregular and different than what you see on the earth. So now what we're suggesting is just go back to the deeds that are all incorporated in our and being clauses and to use that 300-foot line as the dividing line between the mining interests. I thank you. Thank you. All right. Thank you, Your Honors. If I could, I will address this issue, which has been somewhat neglected, of the methods that could be employed. Just briefly, that goes back to your question, Judge Diaz, as to whether the parties intended that Wilson could destroy the surface, even though these specific rights were retained and even though Judge Conrad noted that the parties intended that the property would continue to be used as a working farm. As to that, as to the notion that was just planted before you, that there was some evidence somewhere that this was a moonscape back then, that is a complete non sequitur. The evidence was that this was a busy farm that produced thousands of bushels of produce. We have that evidence. It is in the record. The experts talked about it. What that was contrasted to was if carmoose gets its way, it looks like a moonscape. So that conflation should not confuse you. No moonscape. And by the way, no evidence was heard below. It's a summary judgment record, so there was no evidence. But now back to whether they could employ these techniques, which would, in fact, create a moonscape. We'll just point out that the law on this is clear, that courts will not construe a deed as giving a mineral owner the right to destroy the surface unless the right is given in unmistakably plain terms. To boil this down, Judge Conrad said, well, quarrying is quarrying, and it doesn't matter if you quarry and only create a hole this big that's only going to be down in that yon corner. What's the difference between that and 800 feet down into the earth? A big difference if you reserve the right to use the surface. So if the interpretation given would increase the rights of the grantee or decrease the retained rights of the grantor, it's not valid under Virginia law. That is the basic, simple inquiry. I would refer you to this court's opinion of Mullins v. Beatrice, where this court said the holder of mineral rights may injure the surface only so much as its deed allows. Clearly, when the parties intended that the crops could not be damaged, the timber could not be cut, and all of these things that are specified in the deed, absolute destruction was not contemplated. All right. Now, moving on to the 1901 and 1902 deeds. If we core this down to a nutshell, I would say that the court went far, far, far into the realm of fact-finding in reaching its determination that these deeds conveyed all of the stone estate on the property. And the standard in the Fourth Circuit is that summary judgment can be entered where it's either unambiguous. He found it was ambiguous, and I believe that the appellants maybe dispute that. He said it was ambiguous. So then he can only grant summary judgment, quote, when an ambiguity can be definitively resolved by reference to extrinsic evidence. Now, we think the evidence shows that it was limestone and it was the gray vein, but let's go through this list of exactly what evidence the judge had to ignore and that contradicts his statement. The authorizing order for the sale. That references both the gray vein and the Dillon Tract. The advertisements for sale. They talk about pure gray limestone, 98% carbonate. Bear in mind there's two different types of stone on the property. There's dolomite, which is up at the top. It is not zoned for mining. And then there's limestone that's at the bottom. It is zoned for mining. The terms of the sale reference the gray vein and the Dillon Line. The terms of the deed reference the gray vein and the Dillon Line in 1901. And in 1902, they say the stone and reference the Dillon Boundary. One thing that we neglected to put in the joint appendix, but which is in the record, is that there were appraisals done of this stone at the time of the sale. And one of the appraisers said he was particularly well qualified, and we have this appraisal and it's in the record. He says that he was particularly well qualified because he had worked, quote, the same vein of lime on Colonel Dillon's property next. Now, that, again, makes it pretty clear that our argument that the Dillon Line matters and the vein matters. So all of these things would tend to indicate that they're not talking about all stone on the whole property. They're talking about the gray vein, the limestone, the Dillon Boundary. And if you look in probably the best place to see what I'm talking about is in the expert report, which is found at JA 1162. We gave you a better copy of this yesterday. Unfortunately, in the joint appendix, it did not come out in color. This is the property right here. You don't actually contest that the 1849 deed. No, no, no, no. So your argument is that at some point later, a distinction was drawn. Correct. What happened was the properties were sold out of Chancery. And so I would refer you, when you look at this map, you will see the limestone. This is an official geological map. The limestone is down in this southern part. This light pink up here is dolomite. And what happened is in 1901 and 1902, two deeds came out of Chancery. Those advertisements, terms of sale, all the stuff I was just talking about originate in those proceedings. And in those, the valuable thing was the limestone. Judge Conrad says that in his opinion. He says, well, the reason they only talk about limestone is because that's the only thing that had value. And we agree. That is the only thing that's had value. So the commissioners sold what had value. They sold the limestone. They didn't sell the stuff that nobody was producing. Nobody had ever quarried dolomite in the whole area. I thought that the 1901 deed said it conveyed all the rights that were granted to Wilson. It does not. It says he conveys the limestone along the Gray Vane. It says, quote, also all the rights to all the limestone on the land adjoining the above lands and along. So he says adjoining and along the vane of Gray Limestone. Clearly he was not conveying all of the limestone on the Wilson lands because there's a subsequent deed in 1902 that conveys more. So he's not conveying all. It's all that is both adjoining and along the vane. And then it says it goes to a point 300 feet from the Dillon Line. When you're thinking about the Dillon Line, the Dillon Line is, in fact, only in the southern part of the property. It's shown in diagrams on our mapping. I once again snuck over. Thank you very much. The Thomases request reversal of all of these three major rulings against him. Thank you, Your Honor. Thank you very much. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, Albert Diaz, Loretta Copeland Biggs